UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BRUNO INTERNATIONAL LTD.,        )
                                 )
            Plaintiff,           )    CIVIL ACTION NO.
                                 )    14-10037-DPW
v.                               )
                                 )
                                 )
VICOR CORPORATION,               )
                                 )
            Defendant.           )

MEMORANDUM AND ORDER
September 16, 2015

The plaintiff, Bruno International Ltd. ("Bruno") brings
this action against Vicor Corporation ("Vicor") alleging a
variety of claims of wrongdoing in connection with a contractual
and business relationship that soured.  Vicor has moved to
dismiss all counts of the Complaint against it for failure to
state a claim upon which relief can be granted.  At a hearing on
these motions, I directed the parties to proceed with discovery
on the assumption that at least some portion of the plaintiff's
interrelated claims would survive.  I now grant Vicor's motion
to dismiss as to all but portions of Count I and Count II.

## I. BACKGROUND

I recite the facts as alleged in the Complaint and as set
out in certain documents fairly incorporated therein.  *Beddall*

v. *State Street Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998).

Bruno is an Israeli corporation that sells power products, components, and systems, and provides design, engineering, and technical services, to electronic industry manufacturers in Israel. Compl. ¶ 8. For nearly twenty-five years, Bruno served as the exclusive distributor and representative in Israel for Vicor, a Massachusetts-based and Delaware-incorporated company that manufactures, sells, and supplies modular power components, complete power systems, and customer power solutions globally. *Id.* ¶¶ 1, 9. During the course of this representation, Bruno invested heavily in the Israeli market and created an extensive base of corporate customers. *Id.* ¶¶ 1, 12. These efforts were recognized by Vicor through awards, bonuses, and other commendations. *Id.* ¶¶ 13, 19.

On May 19, 2009, Vicor notified Bruno by email that their exclusive distribution arrangement would not be renewed. *Id.* ¶ 14. Instead, in mid-June, Bruno and Vicor signed a Representation and Distribution Agreement (the "Agreement"), effective June 1, 2009. *Id.* ¶ 14; Doc. 10 (Agrmt.). The Agreement permitted Vicor to "appoint non-exclusive representatives" in Israel and required it "to promote the name of Representatives jointly in any international advertising or promotional material wherever this is practicable[,] and to

distribute sales leads and qualified inquiries to each
Representative." Compl. ¶ 13(c); Agrmt. pg. 1. The Agreement
required Bruno, as a representative, to "use it's [sic] best
efforts to promote the sale of [Vicor's] Products" throughout
Israel, to "furnish [Vicor] with copies of relevant customer
quotations and correspondence," to "submit Point of Sale reports
and forecasts on a regular basis," and to "take all reasonable
precautions to ensure that confidential information received
from [Vicor] . . . will not be divulged to any person outside
its own organization." Agrmt. ¶¶ 15, 18(a)-(d). Under the
terms of the Agreement, Bruno could represent another
manufacturer of similar but not directly competing products in
Israel, with some restrictions. *Id.* ¶ 1. The Agreement also
provided for termination without cause with ninety-days notice
by either party, or termination for cause with thirty-days
notice. *Id.* ¶¶ 24A, 24B.

    After the execution of the Agreement, Vicor informed Bruno
that it would be introducing a second distributor in Israel in
2010. Compl. ¶ 15. Bruno expressed concern to Vicor that a new
distributor would benefit from Bruno's development of the Vicor
brand name in Israel. *Id.* ¶¶ 16, 17. Meanwhile, over the
course of 2010, Bruno increased its own sales in Israel. *Id.*
¶¶ 16, 17. Nonetheless, in January 2011, Vicor appointed Migvan

Technologies & Engineering, Ltd. ("Migvan") as a second
distributor. *Id.* ¶ 17.

Bruno alleges that from this point forward, Vicor strongly
favored Migvan and facilitated Migvan's replacement of Bruno as
the leading distributor of Vicor products in Israel. *Id.* ¶¶ 18,
31. This is said to have taken several forms.

First, Bruno alleges that Vicor encouraged Migvan to
recruit salespeople from Bruno knowing that such transfers would
harm Bruno's sales, and that Migvan successfully recruited one
of Bruno's senior sales engineers. *Id.* ¶¶ 20, 31. That
engineer then won a 2011 Vicor distributor award on behalf of
Migvan. *Id.* ¶¶ 20, 31.

Second, Bruno alleges that Vicor supported Migvan in
actively communicating with existing Bruno customers and making
certain representations to obtain their business. Compl. ¶¶ 2-
6, 22-23, 25-26, 29-31. For example, at meetings arranged by
Bruno at Vicor's request with existing Bruno customers, Vicor
recommended purchasing Vicor products from Migvan rather than
Bruno because Migvan could offer better pricing. *Id.* ¶¶ 25-26.
Migvan further represented to one Bruno customer, Commtact Ltd.
("Commtact"), that it was the exclusive supplier of Vicor
products for that customer. *Id.* ¶ 23. In addition, Bruno
alleges that Vicor refused to accept Bruno's registration of a
new project on behalf of its existing customer, Elbit Systems,

Ltd. ("Elbit"), and instead awarded the sale to Migvan. *Id.*
¶ 22.

Bruno alleges that much of Migvan's undercutting of Bruno's
pricing stems from Vicor's use and sharing of pricing
information provided by Bruno to Vicor under a confidentiality
understanding. In January 2012, Vicor requested "sensitive and
confidential customer pricing information" from Bruno. *Id.*
¶ 27. Bruno provided the requested information, which included
"information relating to pricing, sales, engineering and design
and customer lists developed by Bruno" by email in March 2012,
with the explicit request and understanding that "Vicor would
maintain the confidentiality of Bruno's proprietary
information." *Id.* ¶¶ 28, 47; March 2012 Email. A member of
Vicor's senior management replied: "please be assured I will
keep it confidential." Compl. ¶ 28; March 2012 Email. However,
Bruno alleges that Vicor shared all or part of this confidential
information with Migvan to enable it to undercut Bruno's pricing
with its existing customers and outbid Bruno for new projects.
Compl. ¶¶ 29, 49, 50. In addition, Bruno alleges that Vicor
shared the cost price paid by Bruno for Vicor products with one
of Bruno's customers, Elta Systems, Ltd. ("Elta") and informed
Elta that it would receive better pricing from Migvan. *Id.*
¶ 30. Migvan subsequently submitted bids on new projects for
Elta with lower prices than those submitted by Bruno and

thereafter replaced Bruno as the Vicor distributor for Elta.
*Id.*

Bruno alleges that, in addition to Vicor's facilitation of
Migvan's sales, Vicor took other steps that negatively impacted
Bruno's sales.  First, following additional meetings between
Vicor and Bruno customers arranged by Bruno at Vicor's request,
Vicor began to sell a particular product directly to one of
Bruno's customers, Alma Lasers, Ltd. ("Alma").  *Id.* ¶ 38.  This
product was "a semi-customized power unit that used Vicor
products and was devised by and proprietary to Bruno" and that
had been sold by Bruno to Alma in the past.  *Id.*  Vicor did not
pay Bruno a commission for these sales.  *Id.*

Second, in April 2012, Bruno purportedly learned that it
would not be permitted to sell Vicor's newer, more advanced
product lines (VI-Chip and Picor), but only the "older and less
desirable line of products (Brick)," even though Vicor's future
business was based on the sale of the newer lines.  *Id.* ¶ 32.
Bruno informed Vicor that this "sudden and unilateral decision"
would prevent Bruno "from offering its Israeli customers a
complete power solution for new products" and inhibit future
sales by Bruno.  *Id.* ¶ 33.  Bruno also reminded Vicor that in
2011, it had registered 25 projects with Israeli customers for
VI-Chip and Picor products, demonstrating that it was committed
to selling these product lines.  *Id.* ¶ 34.

In June 2012, Bruno's senior management met with Vicor representatives at the Vicor headquarters to express their concern, apparently to no avail. *Id.* ¶ 36. In October, Vicor notified Bruno by email of its intention to terminate the parties' Agreement effective February 1, 2013. *Id.* ¶ 39. The termination letter indicated that the termination was due in part to a "dramatic reduction in new business generation activity from Bruno." *Id.* Bruno alleges that this termination was motivated by Vicor's preference for Migvan as the Israeli distributor, and that the reduction was the result of Vicor's own efforts to replace Bruno with Migvan. *Id.*

As a result of this alleged conduct by Vicor, Bruno filed this action in January 2014 alleging breach of the implied covenant of good faith and fair dealing (Count I), misappropriation of confidential information (Count II), tortious interference with contractual relationships (Count III), tortious interference with advantageous business relationships (Count IV), and violation of the Massachusetts consumer protection statute, Mass. Gen. Laws ch. 93A, §§ 1, 11 (Count V). Compl. ¶¶ 42-69. Bruno contends that Vicor's wrongful conduct over the course of the five-year period governed by the Agreement caused Bruno to suffer lost profits and other compensatory and consequential damages. *Id.* ¶¶ 45, 52, 56, 61, 68.

Vicor has moved to dismiss all counts of the Complaint, Dkt. No. 8.  For its part, Vicor contends that it complied with the terms of the Agreement governing its relationship with Bruno, and that it merely engaged in reasonable business decision-making regarding the Israeli market for its products and who should service it.

## II. STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Maldonado* v. *Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679).

I "accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff[ ]." *Gargano* v. *Liberty Int'l Underwriters, Inc.*, 572 F.3d 45, 48 (1st Cir. 2009).  Well-pleaded facts are those that are not so conclusory or vague that they are incapable of "remov[ing] the possibility of relief from the realm of mere conjecture." *SEC* v. *Tambone*, 597 F.3d 436, 441 (1st Cir. 2010)

(en banc) (citing *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 554, 555 (2007)); *see Twombly*, 550 U.S. at 555 ("[f]actual allegations must be enough to raise a right to relief above the speculative level").

Facts pleaded "upon information and belief" may be considered "where the facts are peculiarly within the possession and control of the defendant . . . or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records LLC* v. *Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations omitted); *see Menard* v. *CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012).  To the extent Bruno's allegations couched in "information and belief" state non-conclusory, plausible facts and permit plausible inferences, I will consider them, even absent an identification of the basis for those facts.[1]

---

[1] Vicor argues that Bruno must plead with specificity the basis for any allegations it has articulated as being based on "information and belief."  I must reject this argument.  The directive in *Twombly* to provide "factual enhancement" does not elevate the Rule 8 pleading standards to those deployed, for example, to evaluate claims of fraud (e.g., Rule 9(b) or the Private Securities Litigation Reform Act).  *See Bell Atl. Corp.* v. *Twombly*, 550 U.S. 554, 557 (2007); *see also Arista Records LLC* v. *Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).  Instead, under *Twombly*, a plaintiff may not set forth <u>conclusory</u> allegations stating legal propositions "without some further factual enhancement." *Twombly*, 550 U.S. at 557.  "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests . . . .'" *Id.* at 555

Although I am "generally limited to considering facts and documents that are part of or incorporated into the complaint," *Giragosian* v. *Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (citation and internal quotation marks omitted), I may also consider

---

(quoting *Conley* v. *Gibson*, 355 U.S. 41, 47 (1957)).  The plaintiff need only disclose the facts supporting an entitlement to relief; it need not articulate why and how it identified those facts.

The cases Vicor cites do not hold otherwise.  Instead, it is the conclusory nature of the allegations in those cases, rather than their basis, that render them insufficient under Rule 8 and the *Twombly/Iqbal* standard.  *See, e.g.*, *Harman* v. *Unisys Corp.*, 356 Fed. App'x 638, 640-41 (4th Cir. 2009) (per curiam) (unpublished) (plaintiff's allegations based on information and belief were conclusory and therefore insufficient); *Xiong* v. *Fed. Home Loan Mortg. Corp.*, No. 13-cv-0914(SRN/AJB), 2013 WL 6801224, at *8 (D. Minn. Dec. 23, 2013) (plaintiffs' allegations based on information and believe were "merely conclusory assertions without any factual allegations to support them"); *Williams* v. *Calderoni*, No. 11 Civ. 3020(CM), 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012) (observing that plaintiffs may plead based on information and belief but must provide some information rendering the allegation "more than a speculative claim," and rejecting certain allegations based on information and belief because they were "not statements of *fact*; they [were] conclusory"); *Bayco Prods., Inc.* v. *Lynch*, Civ. Action No. 3:10-CV-1820-D, 2011 WL 1602571, at *5-6 (N.D. Tex. Apr. 28, 2011) (plaintiff's allegations did not contain sufficient factual information to allow court to make reasonable inferences necessary "to conclude that the plaintiff has pleaded a plausible, not merely a possible, claim"); *cf. Baker* v. *Murphy*, 495 F. Supp. 462, 465 (D.P.R. 1980) (citizenship of parties where jurisdiction was at issue "should be distinctively and positively averred in the complaint," and allegations "couched in evasive language such as 'upon information and belief' [did] not constitute the affirmative pleading of fact on which the Court must conclude that jurisdiction prevails").  *But see Solis* v. *City of Fresno*, No. 1:11-CV-00053 AWI GSA, 2012 WL 868681, at *8 (E.D. Cal. Mar. 13, 2012) ("[i]n the post-*Twombly* and *Iqbal* era, pleading on information and belief, without more, is insufficient to survive a motion to dismiss").

documents to which "a complaint's factual allegations are
expressly linked." *Beddall*, 137 F.3d at 17.  As indicated
above, I will consider the terms of the Agreement and the March
2012 email exchange between the parties containing Bruno's
point-of-sale report for January 2012.

### III. DISCUSSION

### A.  *Breach of Covenant of Good Faith and Fair Dealing (Count I)*

Massachusetts law implies in every contract a covenant of
good faith and fair dealing, "that neither party shall do
anything which will have the effect of destroying or injuring
the right of the other party to receive the fruits of the
contract." *Uproar Co.* v. *Nat'l Broad. Co.*, 81 F.2d 373, 377
(1st Cir. 1936); *see Chokel* v. *Genzyme Corp.*, 867 N.E.2d 325,
329 (Mass. 2007) (citing *Anthony's Pier Four, Inc.* v. *HBC
Assocs.*, 583 N.E.2d 806, 820 (Mass. 1991)).  The covenant is
based in the expectation that the parties will "remain faithful
to the intended and agreed expectations" of the contract in
performing the obligations therein.  *Chokel*, 867 N.E.2d at 329
(quoting *Uno Rests., Inc.* v. *Bos. Kenmore Realty Corp.*, 805
N.E.2d 957, 964 (Mass. 2004)).

Because the covenant concerns the performance of existing
contractual duties, its scope "is only as broad as the contract
that governs the particular relationship," *Ayash* v. *Dana-Farber
Cancer Inst.*, 822 N.E.2d 667, 684 (Mass. 2005), and it does not

serve to "create rights and duties not otherwise provided for,"
which "the parties were free to negotiate, but did not."
*Chokel*, 867 N.E.2d at 329 (quoting *Uno Rests.*, 805 N.E.2d at
964); *see Dunkin' Donuts*, *Inc.* v. *Panagakos*, 5 F. Supp. 2d 57,
64 (D. Mass. 1998) ("implied covenant of good faith cannot
override the express terms of a contract").

Although the scope of the implied covenant is limited to
the scope of the contract itself, breach of the covenant and
breach of the contract are not synonymous.[2]  A party may breach
the implied covenant by exercising an express contractual power
in bad faith (or with some dimension of unfair dealing), and in
such a way that injures the other party's ability to obtain the
benefits it reasonably expects from the contract.[3]  *See Kuchera*

---

[2] Where a party *has* breached an express term of the contract, a
claim for breach of the implied covenant of good faith and fair
dealing "require[s] additional factual allegations of unfairly
leveraging the contract terms for undue economic advantage."
*Christensen* v. *Kingston Sch. Comm.*, 360 F. Supp. 2d 212, 229 (D.
Mass. 2005).  Bruno does not allege breach of any contract here.
[3] The case law is somewhat unclear on whether the defendant's
conduct need only have "the effect of destroying or injuring the
right of [the plaintiff] to receive the fruits of the contract,"
see, e.g., *Laser Labs, Inc.* v. *ETL Testing Labs., Inc.*, 29 F.
Supp. 2d 21, 24 (D. Mass. 1998) (quoting *Anthony's Pier Four,
Inc.* v. *HBC Assocs.*, 583 N.E.2d 806, 820-21 (Mass. 1991)), or
whether the conduct must also be demonstrably in bad faith, see,
e.g., *Christensen*, 360 F. Supp. 2d at 226 (requiring showing of
"conduct taken in bad faith either to deprive a party of the
fruits of labor already substantially earned or unfair
leveraging of the contract terms to secure undue economic
advantage").  *See Sonoran Scanners, Inc.* v. *Perkinelmer, Inc.*,
585 F.3d 535, 541 (1st Cir. 2009) (noting that it is not
apparent under Massachusetts law whether specific intent is

v. *Parexel Int'l Corp.*, 719 F. Supp. 2d 121, 125 (D. Mass. 2010); *Piantes* v. *Pepperidge Farm, Inc.*, 875 F. Supp. 929, 938 (D. Mass. 1995).

Bad faith, a term with many definitions in this area and more appropriately articulated as "a lack of good faith," can mean acting in a manner that does not "comport[ ] with the parties' reasonable expectations as to performance," *Speakman* v. *Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005) (citations omitted); acting with "dishonest purpose or conscious wrongdoing," *Schultz* v. *R.I. Hosp. Trust Nat'l Bank, N.A.*, 94 F.3d 721, 730 (1st Cir. 1996); or exercising discretionary power under the contract to "recapture opportunities foregone on contracting as determined by the other party's reasonable expectations." *Piantes*, 875 F. Supp. at 938 (quoting *Anthony's Pier Four*, 583 N.E.2d at 473).

In addition to alleging bad faith conduct, a plaintiff must adequately allege causation, that is, that the injury the plaintiff suffers can be tied to the defendant's interference. *See Med. Air Tech. Corp.* v. *Marwan Inv., Inc.*, 303 F.3d 11, 22-23 (1st Cir. 2002). Although causation has been identified as a

---

required). I am persuaded by the First Circuit's framing of the issue that "[e]stablishing a violation of the covenant of good faith and fair dealing requires at least bad faith conduct," *id.*, and further that some injury to or interference with the plaintiff's reasonable expectations must have resulted from that bad faith conduct.

key component of such a claim, see *id.*, the strength of the causal connection required has not been clearly defined in the case law.

Bruno has identified essentially five categories of conduct that it contends interfered with or destroyed its ability to reap the fruits of identifiable rights under the Agreement. Vicor argues that these alleged violations amount to nothing more than complaints about the negotiated terms of the Agreement.  I consider each in turn.

### 1.   Use and Sharing of Bruno's Confidential Information

First, Bruno contends that Vicor improperly shared Bruno's customer pricing information with Migvan to enable it to offer Bruno's existing and prospective customers similar products at lower prices, and with Elta, one of Bruno's customers, for the same purpose.  Compl. ¶¶ 27-30.

Bruno was required to provide customer pricing information to Vicor under ¶¶ 14 and 18 of the Agreement.  Although it is not entirely clear from the Complaint, it appears that Bruno's claim of inappropriate disclosure is limited to "the confidential customer and pricing information" Bruno provided in its March 5, 2012 email, consisting only of its January 2012 point of sale report.  Compl. ¶¶ 28-30; March 2012 Email.  When Bruno provided this report, Vicor assured Bruno that it would "keep it confidential."  Compl. ¶ 28; March 2012 Email.

However, there is no provision in the Agreement itself that explicitly forbids Vicor from sharing such information; rather, the Agreement requires confidentiality only on the part of Bruno. *See* Agrmt. ¶ 15 (requiring Bruno to "take all reasonable precautions to ensure that confidential information received from [Vicor]" would "not be divulged to any person outside its own organization").

Bruno contends that even though Vicor's conduct did not interfere with any expressly articulated right of confidentiality afforded to it by the Agreement, the conduct interfered with two reasonable expectations Bruno held: first, that it would continue to sell Vicor products in Israel, based on the provision in the Agreement requiring Bruno to agree "to effectively promote the sale of all listed products," Agrmt. pg. 1, ¶ 18(a); and second, that Vicor would keep its promise made in March 2012 to keep certain information confidential. Bruno contends that its reasonable expectation of promoting Vicor's products and generating a profit from the sale of such products was effectively destroyed by Vicor equipping Migvan with information by which to acquire Bruno's customers, and by sharing Bruno's pricing information directly with one of its customers in a way that demonstrated to the customer that it could obtain better pricing from Migvan.

It is clear that the parties contemplated confidentiality within their relationship in forming the Agreement but did not negotiate any additional terms that would protect Bruno against precisely this scenario.  However, implicit in any supplier-distributor agreement is the expectation that the distributor will make some profit from the sale of the products, and that the supplier will, at a minimum, not intentionally interfere with the distributor's ability to do so, absent a legitimate business reason.  Bruno reasonably could have expected that Vicor would pursue additional distributors and work to facilitate their entry into the Israeli market, and that Vicor would use Bruno's customer information to improve sales in the region.  However, when Vicor promised to "keep confidential" information that Bruno was required to provide under the Agreement, Bruno could also reasonably expect that Vicor would honor this promise.  Honoring this promise would not involve providing the "confidential" information directly to Bruno's competitor to enable it to take on Bruno's existing customers, or sharing this information directly with Bruno's customers.  Vicor's conduct accordingly interfered with Bruno's reasonable expectations under the Agreement and its exchange with Vicor in March 2012 in relation to Vicor's exercise of its rights under that Agreement.  *See Sonoran Scanners, Inc*. v. *Perkinelmer, Inc.*, 585 F.3d 535, 541-42 (1st Cir. 2009).  In addition,

Bruno's allegations regarding Vicor's motives in sharing this information permit the inference that Vicor acted with a "dishonest purpose or conscious wrongdoing."  *See Schultz*, 94 F.3d at 730.

Bruno must also allege injury stemming from Vicor's conduct.  In *Camp Creek Hospitality Inns, Inc.* v. *Sheraton Franchise Corp.*, 139 F.3d 1396 (11th Cir. 1998), the Eleventh Circuit considered a similar implied covenant claim by a franchisee against a franchisor and, applying Massachusetts law, determined that the plaintiff had not demonstrated that the competitor "used th[e] misappropriated information to restructure its own rates to compete against the [plaintiff]."  *Camp Creek*, 139 F.3d at 1406-07.  Accordingly, even though the plaintiff had submitted evidence that a unit of the defendant had "improperly supplied confidential, competitively sensitive information about [the plaintiff's] . . . pricing structure to [a local competitor]," the court affirmed the district court's grant of summary judgment in favor of the defendant on that claim.  *Id.*  The plaintiff simply had not demonstrated that it was the defendant's misappropriation of the confidential information that injured the plaintiff's right under its contract with the defendant.

Here, in contrast, accepting Bruno's allegations as true, Migvan "was able to" adjust its pricing and target specific

customers of Bruno and *did* do so successfully with respect to at least one Bruno customer, Elta.  Compl. ¶¶ 29-30, 34.  Although Bruno has not explicitly alleged that it was the lower pricing – and not some other factor, such as more timely registration of the project – that led Migvan to obtain the project for Elta or any other customer over Bruno,[4] Bruno's allegations do permit the inference that Vicor's sharing of Bruno's pricing information with Migvan is what enabled it to offer better pricing to Elta and, inferentially, to other customers identified in Bruno's January 2012 point of sale report.  Bruno has also sufficiently alleged that this enablement of competitive pricing injured Bruno's right to effectively promote the sale of Vicor products in Israel.  *See* Agrmt. pg. 1, ¶ 18(a).  All that is required to state a claim of good faith and fair dealing at this stage is an undermining of the contractual right to reap "the fruits of the contract," *Anthony's Pier Four*, 583 N.E.2d at 820, and the plausibility that this caused harm to Bruno.  Bruno's allegations are sufficient to make this showing.

### 2.   Favoritism

Second, Bruno contends that Vicor unfairly promoted and favored Migvan at the expense of Bruno, with the goal of

---

[4] As will be discussed in greater detail *infra*, Section III.D.3, Bruno's allegations do not permit the inference that but for Vicor's disclosure of its confidential information, Bruno would have obtained the projects that Migvan did.

usurping Bruno's business development in the region before terminating its distributor relationship.  Specifically, Bruno alleges that Vicor selected Migvan for projects on which Bruno had performed the requisite project design and engineering work, namely for two existing Bruno customers, Elbit and Elta, Compl. ¶¶ 4, 22, 30; met with Bruno's existing customers to communicate that Migvan was the preferred Vicor distributor in Israel and that it offered better pricing, *id.* ¶¶ 6, 23, 25, 26, 30, 37, 38; and generally enabled Migvan to undercut Bruno, including through encouraging Migvan to hire Bruno's sales professionals, *id.* ¶¶ 2, 15, 18, 20, 21, 31.[5]

The replacement of a long-standing distributor by a new one, with the assistance of the supplier, cannot in and of itself constitute a breach of the implied covenant.  *See Piantes*, 875 F. Supp. at 938 (citing *Anthony's Pier Four*, 583 N.E.2d at 471-72).  Bruno can allege a breach only if it has alleged that Vicor's actions "were motivated by a desire to

---

[5] To the extent Bruno alleges that "many of Migvan's sales of Vicor products in 2011 came from Migvan undercutting Bruno on price with its existing customers," Compl. ¶ 34, this allegation may be seen to arise as a consequence of Vicor's disclosure of Bruno's pricing information, and therefore is not further discussed at this point.  To the extent Bruno argues that Vicor precluded Bruno from selling Vicor's newer product lines, after it had previously registered projects involving these lines, and thereby limited Bruno's ability to provide complete power solutions while enabling Migvan to do so, these claims are addressed *infra*, Section III.A.3.  Compl. ¶¶ 5, 32-34.

deprive" Bruno of a benefit it reasonably expected to obtain or be able to pursue under the Agreement. *Id.; see Chokel*, 867 N.E.2d at 329-30.

Under the express terms of the Agreement, Vicor is permitted to authorize any number of distributors who could compete directly with Bruno. Agrmt. pg. 1. The Agreement incorporates aspirational goals for distributor relations but few restrictions on Vicor's conduct. The section of the Agreement addressing registration of new projects states that Vicor aims "to minimise conflict between distributors," and that when a project registration is awarded to a distributor, Vicor "will seek and obtain agreement from other distributors operating in this territory not to sell products to these registered projects." *Id.* ¶ 20. It further indicates that "[d]istributors should not knowingly interfere with projects registered to other distributors" and will face a penalty if they do so. *Id.*

With regard to solicitation of projects and customers, the Agreement provides that Vicor will "promote the name of the Representatives jointly in any international advertising or promotional material wherever this is practicable and [ ] distribute sales leads and qualified inquiries to each Representative." Agrmt. ¶ 13(c). Vicor further agrees to

provide technical and promotional literature to Bruno and assistance for promotional activities.  *Id.* ¶ 13(a),(b).

Bruno contends that these provisions required Vicor to promote distributors equally and to respect Bruno's preexisting customer relationships, and that many of Vicor's actions in favoring Migvan violated these precepts.  But the language of the Agreement is not so prescriptive.  Bruno could not have expected identical treatment of distributors, nor could Bruno have reasonably expected its sales to remain consistent with the introduction of a new distributor.  Bruno's asserted increase in sales in 2010 and decrease in 2011 naturally aligns with the introduction of a competitor in what was previously an exclusive market.  *See* Compl. ¶¶ 31-33, 40.  Indeed, the Agreement provides financial protection for Bruno losing its exclusive distributor status by opening alternative opportunities and allowing it to represent a similar manufacturer in the region. Agrmt. ¶ 3.  Further, and perhaps more importantly, the Agreement provides no guarantee that Bruno could keep its existing customers or obtain registration on projects for which it had laid the groundwork.  *See* Agrmt. ¶ 20.

Despite the absence of any explicit right to non-interference or equal distribution of projects in the Agreement, Bruno reasonably could have expected to reap some benefit from the Agreement by way of product sales.  To that end, a breach of

the implied covenant could occur where Vicor's exercise of its own discretionary rights impacted Bruno's ability to obtain this general benefit, and where Vicor's exercise of these rights was done in bad faith.  Courts have consistently held that a defendant may not exercise its discretionary rights under a contract "as a pretext" for obtaining an unfair advantage at the expense of the other party.  *See Anthony's Pier Four*, 583 N.E.2d at 820; *see also Speakman,* 367 F. Supp. 2d at 137.  Deliberate actions by a managing company or a supplier that injure the plaintiff's ability to obtain the benefit of the bargain contemplated by their agreements have proven sufficient to support a claim of breach of the implied covenant.

For example, in *Speakman*, the defendant insurance company had vastly decreased its service of existing annuity accounts and stopped accepting applications for new ones, such that the plaintiff insurance agents who sold annuities on behalf of the defendant were unable to meet certain repayment obligations to the defendant because they did not receive adequate commissions. *Speakman*, 367 F. Spp. 2d at 125, 135.  Judge Saylor concluded that even though the agreement between the agents and the company did not guarantee the agents any particular commission amount, the agents "did not bargain for *deliberate* actions on the part of [the company] that made it impossible, or nearly

impossible, for them to earn the commissions contemplated by the contract." *Id.*

Judge Gorton reached a similar conclusion in *Kuchera*, 719 F. Supp. 2d 121.  There, the defendant had a discretionary right by contract to make appropriate business decisions regarding the plaintiff's business "so long as the actions were not taken . . . in bad faith for the principal purpose of frustrating" the plaintiff's ability to meet certain earnings requirements.  *Id.* at 125.  The plaintiff contended that the defendant breached the implied covenant by doing exactly what the contract forbade: it took actions specifically designed to thwart the plaintiff's ability to reach its earnings targets.  *Id.* at 126.  Although the contract granted the defendant this discretionary right, Judge Gorton concluded that the defendant was not free to use it in this fashion, and that the plaintiff's claim survived summary judgment because "[w]hether those actions were merely business disagreements or blunders (as [the defendant] claims) or deliberate actions taken in bad faith (as the plaintiffs claim), are quintessential jury questions."  *Id.* at 126-27.  Although *Kuchera* involved an express "bad faith" contractual position, such a prohibition is precisely what the implied covenant reads into contracts.

*Speakman* and *Kuchera* both involved conduct by the defendants that interfered with the plaintiffs' ability to meet

ancillary goals that were clearly contemplated by the contracts at issue.  In both cases, "the overall spirit of the bargain" justified the plaintiffs' reasonable expectations that the defendants' performance of the contract would not prevent them from achieving these goals.  *See Speakman*, 367 F. Supp. 2d at 132.

Here, Vicor was not required to refrain from supporting new distributors or even from prioritizing a new distributor over Bruno.  Nor has Bruno articulated any expected sales goals or other financial liability with which Vicor's prioritization of another distributor could interfere.  However, Bruno has plausibly alleged that Vicor proactively interfered with Bruno's ability to maintain customers, and therefore its ability to sell Vicor products in accordance with the Agreement, by awarding projects with existing Bruno customers to Migvan.

At least one other court has found such interference potentially actionable.  In *Camp Creek*, 139 F.3d 1396, a case on which Bruno relies heavily, the Eleventh Circuit noted that allegations that the central reservations system of a hotel franchisor systematically favored the local competitor of the plaintiff franchisee over the plaintiff when fielding customer calls clearly "would deprive the [plaintiff] of the benefits of the contract (i.e. reservations) and therefore breach the

covenant of good faith inherent in that agreement." *Id.* at 1406.

Similarly here, Bruno had some expectation in making sales of Vicor products, at least to its existing customers, and has alleged that Vicor's favoring of Migvan deprived Bruno of those expected sales.  Specifically, Bruno has alleged that it sought to register new projects for two existing customers, Elta and Elbit, that were ultimately awarded to Migvan, and it can plausibly be inferred from Bruno's allegations that there may have been other customers identified in its Janaury 2012 point of sale report, such as Commtact, for whom Bruno similarly sought to register projects but was denied them.  Compl. ¶¶ 22, 30, 34.  Whether Vicor's decisions were made for legitimate business reasons – such as incomplete or non-compliant registrations by Bruno of these projects - or with the deliberate, malicious intent to interfere with Bruno's ability to reap the benefits of its Agreement – is a question to be answered on a developed factual record.  *See Kuchera*, 719 F. Supp. 2d at 126-27.  The allegations are sufficient to permit that factual development.

### 3.   Selling Directly to Alma

Bruno also alleges that Vicor engaged in direct sales to one of Bruno's customers, Alma, after Alma refused to begin making purchases through Migvan.  Compl. ¶ 38.  Bruno alleges

that it had previously sold a semi-customized power unit to Alma
that was proprietary to Bruno, and that Vicor took over the
sales of this product to Alma without informing Bruno or paying
a commission.  *Id.* In addition to alleging adequately that this
transfer was done in bad faith and interfered with Bruno's
implied right to sell Vicor products to existing customers
absent a legitimate reason to deny such sales, Bruno has
identified a more specific basis for a breach of the implied
covenant claim as to Alma.

Under the Agreement, Bruno is entitled to a ten percent
standard commission for direct orders placed with Vicor by Bruno
customers.  Compl. ¶¶ 5, 10.  In that connection, Bruno
reasonably could have expected to receive a commission on orders
placed through Vicor from Alma, and accordingly not to have
Vicor interfere with that right.  Bruno therefore may proceed
with its breach of the implied covenant claim regarding Vicor's
direct sales to Alma.

4.  Prohibiting Bruno from Selling Newer Product Lines

Bruno next challenges Vicor's decision not to permit Bruno
to sell its newer product lines – VI-Chip and Picor – after
several years of doing so.  Bruno alleges that it had
"registered 25 significant projects with Israeli customers for
VI-Chip and Picor products" in 2011, but that in April 2012
Vicor ceased permitting Bruno to register projects using these

products.   Compl. ¶¶ 32-34.   The Agreement between Bruno and Vicor provides that Bruno will "effectively promote the sale of all listed products – not just a fraction of the product line," but defines the products as "full product range, Brick Business Unit."   Agrmt. pg. 1, ¶ 1(b), App. A.   Bruno alleges that the Brick product line is Vicor's "older and less desirable" product line.   Compl. ¶¶ 32-33.

Bruno's assertion that it had a reasonable expectation of distributing the newer VI-Chip and Picor lines because Vicor had a custom and practice of permitting Bruno to sell these products until April 2012 does not pass muster.   The Agreement clearly defines the product line it authorized Bruno to sell.   The implied covenant may not be "invoked to create rights and duties not otherwise provided for in the existing contractual relationship."   *Uno Rests.*, 805 N.E.2d at 964.   Bruno does not allege that Vicor's refusal to permit Bruno to sell the newer product lines injured its right to sell the Brick line.

Conceivably, Bruno might have a reasonable expectation that it could complete projects that it successfully registered with Vicor, even if they involved products not expressly listed in the Agreement.   Vicor's allowance and recognition of Bruno's sales of these products could constitute a custom or practice which created a new term of the Agreement.   Alternatively,

registration could arguably create a new contract between the
parties.

But Bruno has not specifically alleged that it was not
permitted to complete its 2011 registered projects involving the
new product lines.  It is unclear from the Complaint whether
Vicor permitted Bruno to go forward with these 25 previously
registered projects, or whether Vicor reassigned the related
products to another distributor.  Compl. ¶ 34.  The latter
scenario cannot reasonably be inferred from the allegations as
they are written.

Accordingly, Bruno's inability to continue to sell VI-Chip
and Picor products cannot serve as a basis for an implied
covenant claim.

### 5.  Termination of the Agreement

Bruno finally asserts that Vicor's termination of the
Agreement was done in bad faith and attributable to Vicor's own
conduct in forcing Bruno out of the market.  Compl. ¶¶ 7, 39,
40.  Under the terms of the Agreement, either party may
terminate the relationship without cause with ninety-days
written notice (or for cause with thirty-days notice).  Agrmt.
¶¶ 24A, 24B.  If Vicor terminated the Agreement without cause,
Bruno could request that Vicor buy back its "in warranty
inventory of [Vicor's] standard module products subject to a 15%
restocking charge."  *Id.* ¶ 24C.  Vicor gave written notice of

termination to Bruno on October 22, 2012, with a termination date of February 1, 2013, 102 days later. Compl. ¶ 39. The notice stated that the termination was "in the best interests of both of our two companies" and was due in part to a "dramatic reduction in new business generation activity from Bruno." *Id.*

Vicor's termination of its relationship with Bruno complied with the terms of the Agreement, and Bruno had no reasonable expectation that the relationship would continue. Nonetheless, Bruno asserts that it had a reasonable expectation that Vicor would not affirmatively impede Bruno's efforts to sell Vicor products and then attribute the termination of the relationship to Bruno's decreased sales. Importantly, however, Bruno does not allege that its termination was considered to be for cause, and that it was accordingly denied its right to exercise the buy-back option under ¶ 24C of the Agreement.

Although the case law in this area recognizes the validity of without-cause provisions in commercial contracts between sophisticated parties, "[a] party's decision to discontinue a line of business may, in certain circumstances, violate the implied covenant of good faith and fair dealing." *Speakman*, 367 F. Supp. 2d at 133 (citations omitted). Where, for example, an employer or other managing party in a contractual relationship seeks through termination to deprive the other party of some income or compensation earned through past services, the

exercise of a without-cause termination provision may be considered to have been in bad faith and therefore a breach of the implied covenant. *See, e.g., Fortune* v. *Nat'l Cash Register, Inc.*, 364 N.E.2d 1251, 1257 (Mass. 1977). Other circumstances indicating a "lack of honesty or taking unfair advantage; or bad faith" can also give rise to a breach, so long as the plaintiff has suffered some loss as a result. *Zapatha* v. *Dairy Mart*, 408 N.E.2d 1370, 1380 (Mass. 1980); *see Artuso* v. *Vertex Pharms., Inc.*, 637 F.3d 1, 9 (1st Cir. 2011); *Elfman & Sons, Inc.* v. *Criterion Mills, Inc.*, 774 F. Supp. 683, 687 (D. Mass. 1991); *see also Zapatha*, 408 N.E.2d at 1380 (bad faith acts can include usurping funds to which plaintiff is reasonably entitled, depriving plaintiff of fairly earned income, or unfairly capitalizing on goodwill or special business development plaintiff has developed in own name).

Even assuming that a reasonable inference of unfair dealing can be made from the allegations, Bruno has not alleged that the bad-faith termination of the Agreement "resulted in 'a depriv[ation] of earnings, loss of good will, or loss of investment." *Piantes*, 875 F. Supp. at 939 (quoting *Gram* v. *Liberty Mut. Ins. Co.*, 429 N.E.2d 21, 27 (Mass. 1981)). Bruno does not allege that Vicor did not pay Bruno its commissions on sales that it had already completed prior to termination, or that Vicor did not buy back Bruno's outstanding inventory

pursuant to ¶ 24C, and therefore cannot claim that Vicor sought to deny Bruno those rights through termination.

To be sure, the buy-back provision does not afford a particularly favorable outcome for Bruno upon termination,[6] and leaves Bruno with no compensation for the good will it developed in the Israeli market during its many years of sales there. *Cf. Piantes*, 875 F. Supp. at 938 (franchisee entitled to 125% of fair market value of route upon termination by franchisor without cause). However, this provision clearly demonstrates that the parties contemplated the question of compensation on termination. They apparently reached an agreement that compensation would be limited to the buy-back of in-warranty stock. The covenant of good faith and fair dealing cannot be used to save a party from a poorly negotiated contract. *See Chokel*, 867 N.E.2d at 329. Where the parties have clearly contemplated a particular issue, "the covenant does not serve to impute greater rights or impose . . . duties not contemplated in the contractual relationship." *Uno Rests.*, 805 N.E.2d at 966. Absent any indication that Bruno has been deprived of a contemplated benefit of the Agreement, such as compensation for

---

[6] The Agreement provides effectively the same – if not a more favorable – buy-back right to Bruno during the life of the Agreement for slow-moving stock. *See* Agrmt. ¶¶ 10, 24C. If Bruno had sought to sell back the stock while the Agreement was in effect, it would not have been subject to the fifteen-percent restocking charge that applies to the termination buy-back.

past sales or investments, Bruno has not plausibly alleged a
breach of the implied covenant in the termination of the
Agreement.  *Cf. Piantes*, 875 F. Supp. at 938 (plaintiff could
not make breach of implied covenant claim, because he did not
demonstrate that defendant did not intend to pay termination
compensation provided by terminated agreement, and therefore
plaintiff did not show that he was deprived of that right or
that defendant's actions "were motivated by a desire to destroy
or injure [plaintiff's] right to receive the fruits of the
consignment agreement," despite allegations that defendant
obtained benefit of plaintiff's years of developing distribution
route in termination); *Zapatha*, 408 N.E.2d at 1373, 1380
(franchisor did not act in bad faith or deal unfairly in
terminating agreement with franchisee pursuant to without-cause
provision, despite suggesting that termination was due to
franchisee's refusal to sign less favorable agreement, because
no showing of affirmative bad faith act, and no showing that
franchisee would lose financial investment or be left with
unsalable inventory or equipment on termination).

        6.    Summary of Adequate Allegations

        In sum, although Bruno has not adequately pled that Vicor's
termination of the Agreement violated the implied covenant of
good faith and fair dealing, Bruno has stated cognizable claim
breach of implied covenant claims as to the following, and with

the following qualifications: (1) Vicor's use and sharing of
confidential information, only as it relates to Elta and those
customers identified in the January 2012 point of sale report
(shared in the March 2012 email) who were offered better pricing
by Migvan or with whom Vicor shared the information contained
therein directly; (2) Vicor's alleged favoritism for Migvan,
only as it relates to Bruno's specific relationships with Elbit,
Elta, and any other customers identified in the January 2012
point of sale report who subsequently made purchases through
Migvan or directly through Vicor before February 1, 2013 (the
date of termination of the Agreement); and (3) Vicor's direct
sales to Alma of a semi-customized power unit that was
proprietary to Bruno.  Bruno has adequately alleged that these
actions – in relation to the identified customers and products –
were inconsistent with its "reasonable understanding of
performance obligations, as reflected in the overall spirit of
the bargain" between Bruno and Vicor, including in its
communications after the Agreement was executed.  *See Speakman*,
367 F. Supp. 2d at 132; *see also Sonoran Scanners*, 585 F.3d at
541-42.  The development of a factual record will be necessary
to decide whether such actions, if proven, were undertaken in
bad faith or with conscious wrongdoing.

**B.   *Misappropriation of Confidential Information (Count II)***

Bruno next alleges misappropriation of confidential

information under Mass. Gen. Laws ch. 93, § 42[7] and common law, based on Vicor's alleged disclosure of Bruno's customer pricing information provided to Vicor in March 2012, which Vicor promised it would "keep . . . confidential," to Migvan to enable it to provide better pricing to customers.[8]  The statutory and common law claims receive effectively the same liability analysis.  *See Incase Inc*. v. *Timex Corp.*, 488 F.3d 46, 52 n.10 (1st Cir. 2007); *Protégé Software Servs., Inc*. v. *Colameta*, 30 Mass. L. Rptr. 127, 2012 WL 3030268, at *11 n.25 (Mass. Super. Ct. July 16, 2012).  To make a claim for misappropriation of trade secrets, "a plaintiff must show: 1) the information is a trade secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used

---

[7] Under Mass. Gen. Laws ch. 93, § 42, "[w]hoever . . . unlawfully takes, carries away, conceals, or copies, or by fraud or deception obtains, from any person or corporation, with intent to convert to his own use, any trade secret, regardless of value, shall be liable in tort . . . ."

[8] As described above, *supra* Section III.A.1, Bruno's claim is based on Vicor's request for and alleged subsequent disclosure of information from Bruno regarding its pricing, sales, engineering and design, and customer lists for the Israeli market.  Compl. ¶¶ 3, 27-30, 47.  Although the Agreement requires that Bruno provide such information to Vicor upon request, when Bruno complied with a request in March 2012 for "sensitive and confidential customer and pricing information," it specifically requested that Vicor keep the information confidential.  *Id*. ¶¶ 27-28.  A Vicor executive responded, "please be assured I will keep it confidential."  *Id*.  Bruno alleges that Vicor thereafter "shared all or part of the confidential information provided by Bruno with Migvan," which enabled Migvan to undercut Bruno in customer pricing and new project bidding.  *Id*. ¶¶ 34, 47-50.

improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase*, 488 F.3d at 52 (citing *Data Gen. Corp.* v. *Grumman Sys. Support Corp.*, 36 F.3d 1147, 1165 (1st Cir. 1994)); *see Peggy Lawton Kitchens, Inc.* v. *Hogan*, 466 N.E.2d 138, 139-40 (Mass. App. Ct. 1984).

### 1.   Trade Secret

Vicor contends that the disclosed information is not a trade secret.  "A trade secret may consist of any . . . compilation of information which is used in one's business, and which [provides] an opportunity to obtain an advantage of competitors who do not know or use it." *J.T. Healy & Sons, Inc.* v. *James A. Murphy & Sons, Inc.*, 260 N.E.2d 723, 736 (Mass. 1970) (citing Restatement (First) of Torts § 757 cmt. b (Am. Law Inst. 1939)).  "A trade secret is by definition only information that is secret or unknown to the trade." *Sutra, Inc.* v. *Iceland Exp.*, Civ. No. 04-11360, 2008 WL 2705580, at *3 (D. Mass. July 10, 2008).  Information that is "readily known or knowable" by the public or within the industry is not considered confidential.  *Foster-Miller, Inc.* v. *Babcock & Wilcox Canada*, 210 F.3d 1, 10 (1st Cir. 2000); *see J.T. Healy*, 260 N.E.2d at 736.  Among the relevant considerations in identifying a trade secret are "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of

measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Jet Spray Cooler, Inc.* v. *Crampton*, 282 N.E.2d 921, 925 (Mass. 1972) (citing Restatement (First) of Torts § 757 cmt. b (Am. Law Inst. 1939)). The confidentiality agreement Bruno and Vicor may have entered into in their March 2012 email exchange regarding the information has no bearing on this inquiry.[9]

A description of a cognizable trade secret must be articulated "with clarity that can be understood by a lay person . . . and distinguish what is protectable from that which is not." *Staffbridge, Inc.* v. *Gary D. Nelson Assocs., Inc.*, No.

---

[9] As the Massachusetts Appeals Court has stated:
"While trade secrets will be protected where a confidential relationship exists even in the absence of a contractual agreement to that effect, a contractual agreement without more does not afford such protection. It must be shown that the processes or machinery here are in fact trade secrets and that access to them was gained in confidence. (footnotes omitted)" . . . . The non-disclosure agreement . . . can only affirm the intent of the parties to be bound by the common law of trade secrets.
*Dynamics Research Corp.* v. *Analytic Scis. Corp.*, 400 N.E.2d 1274, 1287-87 (Mass. App. Ct. 1980) (quoting *Wheelabrator Corp.* v. *Fogle*, 317 F. Supp. 633, 637 (W.D. La. 1970)); *see Lanier Prof'l Servs., Inc.* v. *Ricci*, 192 F.3d 1, 5 (1st Cir. 1999).

024912BLS, 2004 WL 1429935, at *4 (Mass. Super. Ct. June 11, 2004).  Bruno describes the information as "sensitive and confidential customer and pricing information" and as "information relating to pricing, sales, engineering and design and customer lists."  Compl. ¶¶ 27, 47.  That description is fairly open-textured, but the specific customer lists and pricing information at issue here can constitute trade secrets where the information provides its holder with a competitive advantage.  *See Optos, Inc.* v. *Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 239 (D. Mass. 2011); *C.R.T.R., Inc.* v. *Lao*, 31 Mass. L. Rptr. 635, 2014 WL 938803, at *3 (Mass. Super. Ct. Jan. 27, 2014); *Protégé*, 2012 WL 3030268, at *12.  *But see Packaging Indus. Grp., Inc.* v. *Cheney*, 405 N.E.2d 106, 113 (Mass. 1980) (insufficient evidence in record to establish that "confidential customer, vendor, or supplier lists" were trade secrets).  In addition, the *Jet Spray Cooler* factors point toward classifying the information as a trade secret, given Bruno's allegations that it took significant effort to compile and prepare the information, and that the information – especially the pricing information – is central to its business operations and provides it with a competitive advantage.  *See Optos,* 777 F. Supp. 2d at 239.

Although Vicor contends that Bruno's customer list and pricing information was known among distributors and customers

in Israel, I look only to the allegations in the Complaint at
this stage, which do not indicate that Bruno conveyed to
customers the calculations underlying its pricing or the extent
of its customer portfolio, that Bruno previously shared the
information with anyone other than Vicor, or that the
information was otherwise in the public domain.[10] *Cf. CVD, Inc.*
v. *Raytheon Co.*, 769 F.2d 842, 850 (1st Cir. 1985) ("[o]nce a
trade secret enters the public domain," it is no longer a trade
secret); *Swartz* v. *Schering-Plough Corp.*, 53 F. Supp. 2d 95,
100-01 (D. Mass. 1999) (granting defendants' motion to dismiss
because purported trade secret had been previously
disseminated).

Accordingly, I conclude that Bruno has plausibly alleged
that the information constituted a trade secret.

### 2.   Reasonable Steps to Safeguard

If the information was a confidential trade secret, Bruno's
specific request that Vicor keep the information confidential is
sufficient, on the pleadings, to allege that Bruno took
reasonable, affirmative steps to protect its trade secrets.

---

[10] Contrary to Vicor's assertion, Bruno's allegations regarding
salesperson of the year awards do not suggest that Bruno
disseminated the same information in a way that compromised its
confidentiality.  Compl. ¶ 31.  Bruno alleges that these awards
are given by Vicor, with whom the Agreement specifically
requires Bruno to share sales information.

Compl. ¶ 28.  *See Optos*, 777 F. Supp. 2d at 239-40; *cf. Incase*, 488 F.3d at 53.

### 3.   Breach of a Confidential Relationship

To satisfy the final element of the analysis, Bruno must allege that "the defendant breached the duty not to disclose or to use the trade secret." *AthenaHealth, Inc.* v. *Cady*, 31 Mass. L. Rptr. 346, 2013 WL 4008198, at *8 (Mass. Super. Ct. May 2, 2013).  "The essence of an action for the wrongful use of trade secrets is the breach of the duty not to disclose or to use without permission confidential information acquired from another."  *Id.* (quoting *Jet Spray Cooler, Inc*. v. *Crampton*, 385 N.E.2d 1349, 1354 (Mass. 1979)).  This breach can occur by gaining access to or using the information in violation of a confidential relationship, or by the use of improper means.[11]

---

[11] A review of the case law reveals varying approaches to this element.  *See generally 45 Mass. Prac., Employment Law* § 5.23 (2d ed. 2013).  Some courts - in interpreting the oft-recited requirement that "the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret," *see Incase Inc*. v. *Timex Corp*., 488 F.3d 46, 52 (1st Cir. 2007) - have understood Massachusetts law to impose conjunctive requirements that the defendant have acted in breach of a confidential relationship <u>and</u> used improper means.  *See, e.g.*, *EchoMail, Inc*. v. *Am. Exp. Co*., 378 F. Supp. 2d 1, 2-3 (D. Mass. 2005).  However, the Massachusetts state court cases make relatively clear that these are disjunctive alternatives for satisfying the element.  *See USM Corp*. v. *Marson Fastener Corp.*, 393 N.E.2d 895, 903 & n.16 (Mass. 1979); *Peggy Lawton Kitchens, Inc*. v. *Hogan*, 466 N.E.2d 138, 140 (Mass. App. Ct. 1984).  This is the approach adopted either explicitly or implicitly by several judges in this district.  *See, e.g., Comark Commc'ns, LLC* v. *Anywave, LLC*, C.A. No. 13-cv-30183-MAP, 2014 WL 2095379,

*See USM Corp.* v. *Marson Fastener Corp.*, 393 N.E.2d 895, 903 & n.16 (Mass. 1979); *Peggy Lawton*, 466 N.E.2d at 140; *see also Warner-Lambert Co.* v. *Execuquest Corp.*, 691 N.E.2d 545, 547 (Mass. 1998).

Bruno alleges that a confidential relationship was established by Vicor's written promise in the March 2012 email, and that Vicor breached this confidentiality by sharing Bruno's pricing information with Migvan and with Elta, an existing Bruno customer.  Compl. ¶¶ 28-30, 48.  A confidential relationship may exist in the absence of a contract "where disclosures have been made in business relationships between . . . purchasers and suppliers."  *Burten* v. *Milton Bradley Co.*, 763 F.2d 461, 463 (1st Cir. 1985) (citing *Curtiss-Wright Corp.* v. *Edel Brown Tool & Die Co.*, 407 N.E.2d 319 (Mass. 1980)).  In addition, "[a] disclosure expressly received in confidence may create a confidential relationship."  *Id.* (citing Milgrim, Trade Secrets § 4.03 at 4-18)).  Here, Bruno alleges that it manifested an expectation that the objectively confidential information it provided to Vicor would be kept private.  Although the Agreement between Vicor and Bruno permitted Vicor to request information of the type disclosed here, Vicor expressly affirmed Bruno's

at *2 (D. Mass. May 19, 2014); *Blake* v. *Prof'l Coin Grading Serv.*, 898 F. Supp. 2d 365, 393 (D. Mass. 2012); *Optos, Inc.* v. *Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 240 (D. Mass. 2011).

expectation of confidentiality.  *See Foster-Miller*, 210 F.3d at 10.  Vicor then acted contrary to that agreement.  This is sufficient to allege the breach of a confidential relationship, and accordingly to state a claim for misappropriation of trade secrets.  I will therefore deny the motion to dismiss Count II.

## C.  *Tortious Interference with Contractual Relations (Count III)*

A claim of tortious interference with contractual relations requires the plaintiff to allege that "(1) [the plaintiff] had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions."  *G.S. Enters., Inc.* v. *Falmouth Marine, Inc.*, 571 N.E.2d 1363, 1369 (Mass. 1991) (citing *United Truck Leasing Corp.* v. *Geltman*, 551 N.E.2d 20, 22-24 (Mass. 1990)); *see Platten* v. *HG Berm. Exempted Ltd.*, 437 F.3d 118, 130 (1st Cir. 2006).

Bruno identifies three of its prior or existing customers with whom it claims Vicor interfered.  First, it alleges that Vicor refused to accept its registration of a new project for Elbit, even though "Bruno had worked with Elbit and performed the necessary design and engineering to enable the sale to occur."  Compl. ¶ 22.  Second, it alleges that Vicor shared the

41

cost price paid by Bruno for Vicor products with Elta, indicated that better pricing was available through Migvan, and subsequently awarded new projects for Elta to Migvan despite bids for those projects from Bruno. *Id.* ¶ 30. Third, it alleges that Vicor began to sell a propriety Bruno power unit using Vicor products directly to Alma, an entity that had previously purchased the unit from Bruno. *Id.* ¶ 38; *see id* ¶¶ 4-6.[12]

---

[12] Bruno identifies another customer by name in the Complaint – Commtact – but does not identify any specific interference by Vicor with that relationship. *See* Compl. ¶ 23. Bruno also identifies several broad categories of third parties - Israeli customers for whom Bruno sought to register new projects, *id.* ¶ 54(a); Israeli customers with whom Bruno may or may not have had an existing relationship, *id.* ¶ 54(b)-(d), (f); and known existing Israeli customers of Bruno, *id.* ¶ 54(c),(e),(g) – but does not make specific allegations as to these groups.

In addition, Bruno suggests that Vicor intentionally interfered with a contractual relationship by failing to prevent or discourage Migvan from hiring one of Bruno's sales engineers. *See* Compl. ¶ 54(g). Bruno frames this as interference with existing Bruno customer contracts, because the employee transfer "potentially caus[ed] certain Bruno customers to switch to placing their Vicor product orders with Migvan instead of Bruno." *Id.* That claim is too conclusory and attenuated to survive the motion to dismiss. Bruno has not alleged that the employee provided information to Migvan that enabled Migvan to interfere with Bruno's customer relationships, or that Vicor encouraged the employee to do so; instead, it alleges only that "Vicor encouraged Migvan to recruit members of Bruno's sales force," and that Migvan hired one such sales employee. *See TalentBurst, Inc.* v. *Collabera, Inc.*, 567 F. Supp. 2d 261, 269 (D. Mass. 2008). To the extent Bruno suggests a contractual relationship between the employee and Bruno, the claim also must fail. *Cf. id.* at 268 (finding allegation that employee signed non-compete covenant  adequate to establish existence of contract for tortious interference claim, where former employer

Although these allegations demonstrate past and anticipated future sales to these customers, the existence of contracts with any of these customers at the time of Vicor's alleged misconduct cannot be inferred from these facts. *See Twombly*, 550 U.S. at 569 (facts alleged must "nudge the[ ] claims across the line from conceivable to plausible"). Past purchases and potential future purchases, without more, are insufficient to allege the existence of a current contract. *Cf. Armstrong* v. *Rohm & Haas Co.*, 349 F. Supp. 2d 71, 78-79 (D. Mass. 2004) (allegations were too vague regarding volume, nature, and scope of work to be performed, and duration of contract, to permit court to fill in missing details without writing contract for parties); *Bowditch & Dewey, LLP* v. *Diecast Realty Holdings, LLC*, 23 Mass. L. Rptr. 25, 2007 WL 2705856, at *5 (Mass. Super. Ct. Aug. 30, 2007) (precatory communications expressing desire to pay plaintiff money owed to it and to try to negotiate with prospective buyer for defendant did not establish existence of contract). There are no allegations supporting the inference that Bruno's preparatory work for projects for any of these customers was done pursuant to a contract between the customer and Bruno, or that Bruno had any ongoing contracts for future sales to these customers.

---

alleged that competitor intentionally interfered with contract in hiring employee).

Although Bruno emphasizes the registration process described in the Agreement as permitting the inference of a contract from Bruno's registration attempts on behalf of Elbit and Elta, the Agreement does not indicate that when a distributor seeks to register a new project on behalf of a customer it has already entered a binding agreement with that customer, nor does it provide a definition for a distributor's customer that would imply the existence of a contract for ongoing order placement. *See* Compl. ¶¶ 22, 30; Agrmt. ¶ 20. Accordingly, in the absence of any actionable contract, I will dismiss Count III. *See Twombly*, 550 U.S. at 556.

## D. *Tortious Interference with Advantageous Business Relationships (Count IV)*

As with a claim of interference with contractual relations, a claim of tortious interference with advantageous business relationships requires that "[1] a business relationship from which the plaintiff might benefit existed; [2] the defendant knew of the relationship; [3] the defendant intentionally interfered with the relationship for an improper purpose or by improper means; and [4] the plaintiff was damaged by that interference." *Pembroke Country Club, Inc.* v. *Regency Savings Bank, F.S.B.*, 815 N.E.2d 241, 245 & n.7 (Mass. App. Ct. 2004) (citing *United Truck*, 551 N.E.2d at 22-24).

1.   Business Relationships Known to the Defendant

Although Bruno did not identify any contracts with its customers, its allegations are sufficient to demonstrate advantageous business relationships with them.  *See Am. Private Line Servs., Inc.* v. *Eastern Microwave, Inc.*, 980 F.2d 33, 36 (1st Cir. 1992); *Brown* v. *Armstrong*, 957 F. Supp. 1293, 1304-1305 (D. Mass. 1997).  Bruno plausibly alleges that it had a reasonable expectancy of receiving a financial benefit from its relationships with Commtact, Elbit, Elta, and Alma, and that it had engaged in some level of negotiations in anticipation of future sales agreements with these and numerous other existing or prospective customers.  Compl. ¶¶ 22, 23, 30, 34, 38.  *See Am. Private Line*, 980 F.2d at 36; *Owen* v. *Williams*, 77 N.E.2d 318, 322 (Mass. 1948).  That Bruno has not identified all of the customers by name does not defeat its claim at this stage.[13]  *See Guest-Tek Interactive Entm't Inc.* v. *Pullen*, 731 F. Supp. 2d 80,

---

[13] Bruno alleges that "it registered 25 significant projects with Israeli customers" in 2011 using the VI-Chip and Picor products, which Vicor informed Bruno it could no longer sell as of April 2012.  Compl. ¶¶ 32, 34.  At the hearing on this motion, Bruno represented that it had identified 40 existing customers with whom Vicor had interfered, presumably based on its January 2012 point of sale report.  The precise number of customers is presumably the subject of discovery.  It should be noted, however, that Bruno's claim would be limited only to those customers with whom it had "a 'probable future business relationship anticipating a reasonable expectancy of financial benefit.'"  *Singh* v. *Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 48 (1st Cir. 2002) (citation omitted).

87-88 (D. Mass. 2010).  The supplier-distributor relationship between Vicor and Bruno, and Bruno's provision of a customer list to Vicor in March 2012, make clear that Vicor would have known about these relationships.  Compl. ¶¶ 28, 34.

### 2.  Intentional, Improper Interference

The interference Bruno identifies in its Complaint includes recommending Migvan instead of Bruno to customers, encouraging Migvan to contact Bruno's customers, awarding registered projects to Migvan instead of Bruno, sharing confidential pricing information with Migvan and with a customer (Elta), prohibiting Bruno from selling the newer Vicor product lines (VI-Chip and Picor), and encouraging Migvan to hire one of Bruno's sales engineers.  Compl. ¶¶ 2-7, 20, 38, 53.  Several of these actions were expressly permitted or at least not prohibited by the Agreement between Vicor and Bruno. Nonetheless, to the extent this conduct negatively impacted Bruno's relationships with its existing and probable future customers, I find that Bruno has plausibly – albeit tenuously – alleged some level of intentional interference.  *See Pine Polly, Inc.* v. *Integrated Packaging Films IPF, Inc.*, Civ. Action No. 13-11302-NMG, 2014 WL 1203106, at *5 (D. Mass. Mar. 19, 2014).

However, Bruno must allege "something more than intentional interference."  *United Truck*, 551 N.E.2d at 23 (adopting Restatement (Second) of Torts § 766 (Am. Law Inst. 1979) and

replacing previously used "malicious conduct" with "improper conduct"). Specifically, Bruno must allege that Vicor used improper means or had an improper motive in interfering with Bruno's business relationships. *Id.* Section 767 of the Restatement (Second) of Torts (Am. Law. Inst. 1979) offers several factors to consider in assessing whether conduct is improper, including the nature of the conduct, the interests sought to be advanced by the defendant and those of the others with whom the defendant interferes, and the proximity or remoteness of the defendant's conduct to the interference. *See United Truck*, 551 N.E.2d at 24 n.10.

a.    *Improper Means*

Improper means can include violating a statute or a common-law rule; engaging in threats, misrepresentation, or defamation; or using any other similar means to interfere with the plaintiff's relationships. *United Truck*, 551 N.E.2d at 24; *Cavicchi* v. *Koski*, 855 N.E.2d 1137, 1142 (Mass. App. Ct. 2006). Bruno has not alleged interference through improper means on these facts, with one exception.

Turning first to the inadequate allegations, Bruno has not plausibly alleged any misrepresentation, coercion, or impropriety (in means) with regard to Vicor's selection of Migvan for certain new projects, encouraging of Migvan to represent itself as the primary distributor in Israel, or

preventing of Bruno from selling the newer Vicor product lines.[14]
*See Am. Paper Recycling Corp.* v. *IHC Corp.*, 707 F. Supp. 2d 114,
123 (D. Mass. 2010).  None of these actions were prohibited by
the terms of the Agreement between Bruno and Vicor.  *See, e.g.*,
Agrmt. ¶ 20.

Nor does Bruno allege that Vicor threatened to prevent
Israeli customers from purchasing Vicor products if they did not
do so through Migvan or Vicor directly, or that Vicor offered
Israeli customers anything more than better pricing and service
if they purchased from Migvan instead of Bruno.  *Cf. Holmes
Prods. Corp.* v. *Dana Lighting, Inc.*, 958 F. Supp. 27, 30, 32 (D.
Mass. 1997) (where competitor-defendant threatened to withdraw
all business from supplier if supplier sold to plaintiff, and
supplier complied, competitor had improperly used "leverage" to
create breach).

To the extent Bruno contends that Vicor's disclosure of
confidential information to Migvan in order to enable Migvan to
offer more competitive pricing constitutes an improper means,
that claim is too attenuated.  *See* Compl. ¶ 29.  The improper
means must be in the interference itself.  The only direct
disclosure to a customer Bruno identifies is that Vicor showed

---

[14] Bruno's allegation that Migvan misrepresented itself to
Commtact as "Commtact's exclusive supplier of Vicor products"
does not directly impute any conduct to Vicor.  *See* Compl. ¶ 23.

Elta the cost price paid by Bruno and subsequently awarded projects with Elta to Migvan.  Compl. ¶ 30.

However, to the extent Bruno has alleged that this pricing information was confidential and its disclosure constituted a breach of the implied covenant of good faith and fair dealing, Bruno has adequately alleged that the means by which Vicor enabled Migvan to offer better pricing, which inferentially led to its selection over Bruno for Elta's projects, was improper.

### b.  Improper Motive

Bruno's allegations of improper motive have somewhat broader plausibility.  Improper motive includes ill will toward the plaintiff or some ulterior motive, based on the particular facts and circumstances of the case.  *See Draghetti* v. *Chmielewski*, 626 N.E.2d 862, 869 (Mass. 1994); *G.S. Enters.*, 571 N.E.2d at 1370; *Adcom Prods., Inc.* v. *Konica Bus. Machines USA, Inc.*, 668 N.E.2d 866, 869 (Mass. App. Ct. 1996).  Bruno alleges that Vicor's conduct was "designed to undermine and interfere in Bruno's relationships with its Israeli customers and its position and reputation in the Israeli market in favor of a new distributor and representative, Migvan." Compl. ¶¶ 2-7, 18, 29, 41.  Bruno also alleges that the variety of actions Vicor took to this end were designed to justify Vicor's termination of its relationship with Bruno in 2013, by citing a "dramatic reduction in new business generation activity from Bruno." *See* Compl.

¶ 39.   Bruno has plausibly alleged that Vicor's motive was to convince customers to purchase products through Migvan, and to enable Migvan to offer competitive pricing to the same customers to whom Bruno had sold Vicor products previously, in order to leverage Bruno's customer relationships – and the information it possessed about certain customers – to Vicor's and Migvan's advantage prior to terminating its relationship with Bruno.

It is well-settled that a defendant's motive to obtain financial benefit for itself, absent any motive to hurt the plaintiff, is not sufficient to establish improper motive, particularly in the commercial context. *See, e.g., Am. Private Line*, 980 F.2d at 34, 37 (serving own financial benefit by offering lower prices constitutes lawful competition and is not improper motive); *Sherman* v. *Clear Channel Outdoor, Inc.*, 889 F. Supp. 2d 168, 177 (D. Mass. 2012) (acting for own business purposes to defeat competitor's plans is not improper motive); *Am. Paper Recycling*, 707 F. Supp. 2d at 122 ("legitimate advancement of one's own economic interests is never 'improper' [motive]") (citing *Pembroke*, 815 N.E.2d 241)); *TalentBurst, Inc.* v. *Collabera, Inc.*, 567 F. Supp. 2d 261, 269 (D. Mass. 2008) ("Advancement of one's economic interest . . . is not an improper motive"); *King* v. *Driscoll*, 638 N.E.2d 488, 494-95 (Mass. 1994) ("motivation of personal gain, including financial gain . . . generally is not enough" for improper interference);

*United Truck*, 551 N.E.2d at 24 (no improper motive where defendant's "apparent motives were to benefit his customers and himself financially"); *Bourque* v. *Cape Southport Assocs., LLC*, 800 N.E.2d 1077, 1082 (Mass. App. Ct. 2004) (no improper interference where "[t]here is no indication that the defendant acted for any purpose other than the protection of its own business interests," even if "plaintiff's business opportunity may have been affected indirectly").

Were Vicor and Bruno direct competitors, Vicor's actions and motives would not be improper under this case law if designed solely to advance Vicor's own financial interests. *See United Truck*, 551 N.E.2d at 24. But the parties here are not competitors, and this conduct was designed not solely to ensure Vicor's own commercial success, but rather also to transfer Bruno's business relationships to a third party. Although much of Vicor's conduct was permitted by the Agreement it had with Bruno, Bruno's allegations are sufficient to allege that this conduct was motivated by a desire to drive Bruno out of business while usurping its business relationships. This motive, depending on whether and how it is proven, could plausibly be an improper one in light of the distributor-supplier relationship between Vicor and Bruno, and the reasonable assumption that Vicor would support Bruno's endeavors to sell its products rather than thwart them. *See Ayash*, 822 N.E.2d at 690

("propriety of an actor's motive, or conduct, in a particular setting necessarily depends on the attending circumstances, and must be evaluated on a case-by-case basis"); *cf. APG, Inc.* v. *MCI Telecomms. Corp.*, 436 F.3d 294, 303 (1st Cir. 2006) (concluding that defendant's conduct, including assuring potential customer of better service through direct sale rather than purchasing through distributor, despite distributor's efforts to cultivate customer relationship, "amounted to unjustified interference with [plaintiff's] development relationship with [customer]"); *Getty Petroleum Mktg., Inc.* v. *2211 Realty, LLC*, Civ. Action No. 11-40003-FDS, 2012 WL 527655, at *5 (D. Mass. Feb. 16, 2012) (applying similar standard under Rhode Island law and denying motion to dismiss because defendant alleged in counterclaim that plaintiff "knew of defendants' relationship with their customers and that its actions prevented those customers from continuing the business relationship," and reasonable inference could be made from counterclaim's allegations that plaintiff took underlying actions "to interfere with defendants' customer relationships in order to pressure them to alter their contractual arrangement"). Accordingly, the allegations satisfy this element.

### 3. Harm to the Plaintiff

Regardless of whether Bruno has adequately alleged improper means or motive, it has not adequately alleged that the harm it

suffered was caused by Vicor's interference.

A plaintiff must allege some economic harm, see *Cachopa* v. *Town of Stoughton*, 893 N.E.2d 407, 413 (Mass. App. Ct. 2008), and that the harm or loss of advantage resulted directly from the defendant's interference. *United Air Lines, Inc.* v. *Gregory*, 716 F. Supp. 2d 79, 87 (D. Mass. 2010) (citing *Singh* v. *Blue Cross & Blue Shield of Mass., Inc.*, 182 F. Supp. 2d 164, 178 (D. Mass. 2001)); *see Adcom Prods.*, 668 N.E.2d at 869-70.

Bruno adequately alleges that it lost numerous business relationships and the opportunity to sell Vicor products in Israel.  Compl. ¶¶ 7, 33, 39.  It asserts that, given the longstanding nature of its relationship with its customers, the customers' shift to purchasing from Migvan or Vicor supports the conclusion that but for Vicor's improper interference, those customers would have continued to purchase products directly from Bruno.  This argument is not supported by factual, non-conclusory allegations making it plausible that Bruno's decreasing sales were attributable to Vicor's actions rather than to more competitive bids from another distributor or Vicor's exercise of its own discretion under the Agreement to award projects to other distributors.  *See* Agrmt. ¶ 20.[15]

---

[15] There is a nuanced but determinative difference between the injury alleged for Bruno's breach of the implied covenant claim – that is, the deprivation of Bruno's ability effectively to promote Vicor products in Israel and reap the benefits of the

Bruno's allegations regarding Elta – which are the most specific in the Complaint – illustrate how the allegations overall are insufficient to show the causation required for this claim.  Paragraph 20 of the Agreement states that "[i]t is the Seller's intention that the first distributor to register with Seller the project registration information outlined below regarding a new project should gain control of that project." Bruno does not allege that it was first in submitting a compliant registration for the Elta projects that were ultimately awarded to Migvan.  Instead, it alleges only that Migvan submitted bids on projects for Elta "and offered prices below that submitted by Bruno for the same projects," and that Migvan was awarded the projects for Elta.  Compl. ¶ 30.  It cannot be inferred from this allegation – or from the allegation that Bruno had registered other projects for Elta previously – that Bruno satisfied the registration criteria and did so before Migvan did.[16]

---

Agreement – and the injury alleged for Bruno's tortious interference claim – that is, loss of specific advantageous business relations manifested in specific product sales.
[16] Similarly, with regard to Bruno's claim that Vicor began selling directly to Alma, one of Bruno's existing customers, Bruno has not alleged that it attempted to register any projects on behalf of Alma that were rejected despite compliance with the requirements of registration provisions of the Agreement. Accordingly, the allegations do not connect any harm that resulted to Bruno from Vicor's direct sale to Alma to any improper conduct on Vicor's part that would be cognizable as tortious interference.  *See* Compl. ¶ 38.

Although I can find no First Circuit precedent providing direct guidance in this area, an Eleventh Circuit case on which Bruno relies for other points is instructive here. *See Camp Creek*, 139 F.3d 1396. In *Camp Creek*, the Eleventh Circuit affirmed the grant of summary judgment for the defendant-franchisor on the plaintiff-franchisee's claims of tortious interference with business relations.[17] *Camp Creek*, 139 F.3d at 1409. Recognizing that the defendant had engaged in numerous improper acts directing customers to a local competitor franchisee, the court nonetheless concluded that the plaintiff had not presented evidence that customers chose the competitor because of any of the defendant's wrongful activities; instead, the evidence demonstrated that the competitor "offered to meet or beat the [plaintiff's] rates." *Camp Creek*, 139 F.3d at 1409. The plaintiff could not connect lost customers to the

---

[17] On the plaintiff's claim of tortious interference with contractual relations, the Eleventh Circuit rejected the plaintiff's assertion that a franchisor and franchisee have a special relationship forbidding the franchisor from engaging in competitive business activities that might interfere with the franchisee's efforts, because the franchisor-defendant and the plaintiff were "not engaged in a partnership to pursue business" in the region. *Camp Creek Hospitality Inns, Inc.* v. *Sheraton Franchise Corp.*, 139 F.3d 1396, 1408 (11th Cir. 1998). Accordingly, it held that the defendant's "choice to compete against the [plaintiff] was subject to the competitive privilege [under Georgia law] and was not 'improper' or 'wrongful' in the sense used in Georgia's cases on tortious interference with contract." *Id.* at 1409.

defendant's improper acts, and therefore could not establish a causal connection. *Id.*

As in *Camp Creek*, Bruno fails to plead a causal connection in anything more than the most conclusory fashion. *Cf. APG, Inc.*, 436 F.3d at 305 (no causation in tortious interference claim under Rhode Island law because plaintiff could not prove that it was "at least 'reasonably probable' that [customer] would have completed a deal to purchase prepaid phone cards through [third-party distributor with whom plaintiff was working] had [defendant] not interfered improperly in the bidding process"). Accordingly, I will dismiss Count IV.

## E.  *Violation of Chapter 93A, Section 11 (Count V)*

To state a claim under the Massachusetts consumer protection statute, Mass. Gen. Laws ch. 93A, §§ 1, 11, a plaintiff must allege "some form of deceptive or unfair conduct." *States Res. Corp.* v. *The Architectural Team, Inc.*, 433 F.3d 73, 84 (1st Cir. 2005). "A finding that a party has . . . violated the implied covenant of good faith and fair dealing" can satisfy this requirement. *Kuchera*, 719 F. Supp. 2d at 129 (citing *Aware, Inc.* v. *Centillium Comms., Inc.*, 604 F. Supp. 2d 306, 311 (D. Mass. 2009); *Anthony's Pier Four*, 583 N.E.2d at 821)); *see RGJ Assocs., Inc.* v. *Stainsafe, Inc.*, 338 F. Supp. 2d 215, 235 (D. Mass. 2004) (citing *Cool Light Co.* v. *GTE Prods. Corp.*, 973 F.2d 31, 33 n.3 (1st Cir. 1992)).

However, § 11 also requires that the unfair or deceptive conduct "occurred primarily and substantially within the commonwealth." *See* Mass. Gen. Laws ch. 93A, § 11.  To satisfy this locality requirement, "the center of gravity of the circumstances that gave rise to the claim" must be in the Commonwealth.  *Kuwaiti Danish Computer Co.* v. *Digital Equip. Corp.*, 781 N.E.2d 787, 798-99 (Mass. 2003).  The defendant bears the burden of proving that the acts did not occur primarily and substantially within the Commonwealth.  Gen. Laws. ch. 93A, § 11; *Kuwaiti*, 781 N.E.2d at 797.

The locality inquiry is necessarily "fact intensive and unique to each case," and the Supreme Judicial Court has suggested that a judge should best make a locality determination "after making findings of fact, and after considering those findings in the context of the entire § 11 claim." *Kuwaiti*, 781 N.E.2d at 798-99; *see Kenda Corp.* v. *Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 234-35 (1st Cir. 2003).  Based on this language in *Kuwaiti*, judges have shown some reluctance about granting motions to dismiss based on locality, and have permitted § 11 claims to go forward where the plaintiff has alleged that it is located in and claims some injury in Massachusetts, reserving the *Kuwaiti* assessment for after the

factual record has been developed.[18]  *See, e.g.*, *iLab Solutions
LLC* v. *Idea Elan, LLC*, No. 14-cv-14267-ADB, 2015 WL 1505698, at
*2-3 (D. Mass. Apr. 1, 2015) (denying motion to dismiss § 11
claim because plaintiff is located in Massachusetts, claims
injury in Massachusetts, and "has alleged a greater connection
between the wrongful conduct and Massachusetts"); *SCVNGR, Inc.*
v. *eCharge Licensing, LLC*, Civ. Action No. 13-12418-DJC, 2014 WL
4804738, at *6-7 (D. Mass. Sept. 25, 2014) (denying motion to
dismiss § 11 claim because plaintiff claimed injury in
Massachusetts, where its principal place of business is
located); *AcBel Polytech, Inc.* v. *Fairchild Semiconductor Int'l,
Inc.*, Civ. Action No. 13-13046-DJC, 2014 WL 4656608, at *6-7 (D.
Mass. Sept. 12, 2014) (denying motion to dismiss § 11 claim
because plaintiff claimed injury in Massachusetts, where its
U.S. facilities are located and where it suffered increased

---

[18] Immediately on the heels of the *Kuwaiti* decision, Judge
Collings expressed the view that "a motion to dismiss is no
longer an appropriate vehicle for raising the issue" of locality
because this determination requires findings of fact. *Workgroup
Tech. Corp.* v. *MGM Grand Hotel, LLC*, 246 F. Supp. 2d 102, 118
(D. Mass. 2003); *see Fleet Nat'l Bank* v. *Certain Underwriters at
Lloyd's, London*, No. 022673BLS, 16 Mass. L. Rptr. 212, 2003 WL
21246552, at *1-2 (Mass. Super. Ct. May 14, 2003) (denying
motion to dismiss based on defendant's argument that acts did
not occur primarily and substantially in Massachusetts because
court could not reconcile liberal pleading standards with
*Kuwaiti*'s direction to make findings of fact on locality).  More
recently, however, judges have embarked on the *Kuwaiti* analysis
at the motion to dismiss stage, and I will do so here.  I find
early warnings of the demise of meaningful motion to dismiss
practice on the locality inquiry to be overstated.

costs); *Berklee Coll. of Music, Inc.* v. *Music Industry Educators, Inc.*, 733 F. Supp. 2d 204, 213 (D. Mass. 2010) (denying motion to dismiss § 11 claim because plaintiff "acted and continue[d] to act on the wrongful conduct in Massachusetts and . . . sustained and continue[d] to sustain losses caused by the wrongful conduct in Massachusetts," and "at the very least factual issues remain[ed] as to where the conduct primarily and substantially occurred").  The denial of motions to dismiss based on locality is so common that in a recent opinion, the Massachusetts Appeals Court noted that it could not identify "any appellate case in which the center of gravity of a § 11 claim was determined adversely to a plaintiff upon a motion to dismiss." *Resolute Mgmt. Inc.* v. *Transatlantic Reinsurance Co.*, 29 N.E.3d 197, 201 (Mass. App. Ct. 2015).[19]

---

[19] Although the Appeals Court's survey in *Resolute Management* identified several federal trial court rulings denying motions to dismiss based on locality, it also identified one that did dismiss a chapter 93A claim on this basis.  *See Resolute Mgmt.*, 29 N.E.2d at 201 n.6 (citing *Iantosca* v. *Benistar Admin Servs., Inc.*, 738 F. Supp. 2d 212, 220 (D. Mass. 2010).  There are other federal trial court rulings reaching similar conclusions.  In a 2014 case, Magistrate Judge Bowler – whose recommendation was adopted by Judge Gorton – assessed whether a complaint adequately alleged that the center of gravity of claimed conduct took place primarily and substantial in Massachusetts, and concluded that it did not.  *See Pine Polly, Inc.* v. *Integrated Packaging Films IPF, Inc.*, Civ. Action No. 13-11302-NMG, 2014 WL 1203106, at *9 (D. Mass. Mar. 19, 2014); *see also Weber* v. *Sanborn*, 502 F. Supp. 2d 197, 199 (D. Mass. 2007) (allowing motion for judgment on pleadings because complaint "offered no facts that would warrant invoking [§ 11]," because "there is simply no connection alleged to link the events at issue, or the

Although a defendant surely bears a demanding burden on a motion to dismiss when claiming that the locality requirement is not satisfied, see *iLab Solutions*, 2015 WL 1505698, at *2-3, I do not read *Kuwaiti* as entirely foreclosing resolution of this issue before any fact discovery has occurred.  Instead, *Kuwaiti* and the cases interpreting it seem to permit the dismissal of a claim in the circumstance where a plaintiff has not pled that it suffered a loss within the Commonwealth.  This is consistent with the plaintiff's core responsibility to set forth factual allegations to support each material element of its claim.  *See Twombly*, 550 U.S. at 555-58; *Berner* v. *Delahanty*, 129 F.3d 20, 25 (1st Cir. 1997).  As the Massachusetts Appeals Court has observed, it is "difficult to imagine" how the nuanced assessment called for by *Kuwaiti* "might be made on the basis of the allegations of the complaint alone—at least where . . . the loss occurred in Massachusetts." *Resolute Mgmt.*, 29 N.E.3d at 201.  To be sure, it will be a rare case that does not offer such allegations.  But this is such a case.

The connections to Massachusetts alleged in the Complaint are minimal and do not identify Massachusetts as the place where Bruno suffered a loss.  Vicor's headquarters and principal place of business is in Massachusetts.  Compl. ¶ 9.  Bruno alleges

---

harm allegedly suffered by the Plaintiff, to the state of Massachusetts").

that its executives met with Vicor representatives in person in
Massachusetts when Vicor first indicated that it planned to
introduce another distributor in the Israeli market, and again
when Bruno became concerned that Vicor was giving preference to
Migvan.  *Id.* ¶¶ 16, 36.  Bruno argues, but does not allege, that
it can be inferred that the executive decisions to engage in the
alleged conduct were made at Vicor's headquarters in
Massachusetts, including the decisions to award certain projects
to Migvan instead of Bruno.

But the allegations suggest an overwhelming connection to
Israel.  At the heart of Bruno's allegations of unfair dealing
are Vicor's communications with Bruno customers encouraging them
to purchase from Migvan or Vicor directly, most of which Bruno
alleges occurred through in-person meetings in Israel.  Compl.
¶¶ 6, 25, 26, 30, 37, 38.  Bruno's loss of its customers and its
investment was suffered in Israel, where Bruno is based.  *Id.*
¶ 8.  The claims all pertain to Israeli customers (and another
Israeli distributor) and the sale of Vicor products in that
market alone.

Taking the factual allegations in the Complaint as true and
making all reasonable inferences in Bruno's favor, Bruno itself
has characterized the unfair acts or practices as occurring
primarily and substantially in Israel.  *See Kuwaiti*, 781 N.E. 2d
at 798-99.  As in *Kenda Corp.*, 329 F.3d at 236, the activities

that occurred in Massachusetts "were ancillary to, and a direct result of, misrepresentations made and contracts signed in [another state]," and therefore the "center of gravity" of the allegedly unfair conduct was outside of the Commonwealth. Similarly, in *Lyons* v. *Gillette*, 882 F. Supp. 2d 217, 234 (D. Mass. 2012), the allegations were insufficient to support a chapter 93A claim because all of the alleged bad acts had occurred outside of Massachusetts, even though the plaintiff's principal place of business was in Massachusetts.

Here, Bruno's principal place of business is in Israel, and it felt the consequences of Vicor's conduct in the Israeli market.  Compl. ¶¶ 6- 8, 12; *see Workgroup Tech. Corp.* v. *MGM Grand Hotel, LLC*, 246 F. Supp. 2d 102, 117 (D. Mass. 2003) ("It is the location of the person to whom the deceptive statements are made rather than the location of the person who uttered the deceptive or unfair statements that is significant." (citing *Clinton Hosp. Ass'n* v. *Corson Group, Inc.*, 907 F.2d 1260, 1266 (1st Cir. 1990)); *cf. Unum Grp.* v. *Benefit P'ship, Inc.*, 938 F. Supp. 2d 177, 188 (D. Mass. 2013) (center of gravity was in Massachusetts because defendants were Massachusetts residents, and payments at issue were paid to and withdrawn from Massachusetts bank).

Bruno cannot establish as a matter of law that the unfair or deceptive acts occurred primarily and substantially in

Massachusetts.  In *Berklee College*, 733 F. Supp. 2d at 213, a case on which Bruno relies for support, Judge Tauro acknowledged that there could be a case in which the plaintiff made an "extraordinary concession" regarding the principal locality that would warrant dismissal of the claim before the development of the factual record.  Here, Bruno has affirmatively placed many of the allegedly unfair acts or practices in Israel, leaving little to have occurred in Massachusetts aside from some executive decision-making and potential communications with distributors and customers in Israel.  *Cf. Picker Int'l* v. *Leavitt*, 865 F. Supp. 951, 971 (D. Mass. 1994) (where "virtually all of [defendant's] purported misconduct, and any harm to [plaintiff], occurred outside of Massachusetts," summary judgment in favor of defendant on 93A claim was appropriate). Accordingly, I will dismiss Bruno's chapter 93A claim.

### IV. CONCLUSION

The defendant's motion to dismiss, Dkt. No. 8, is GRANTED as to Counts III, IV, and V; GRANTED in part and DENIED in part as to Count I; and DENIED as to Count II, as set forth more fully above.


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE